1

2

3

4

5

6           IN THE UNITED STATES DISTRICT COURT

7          FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   BARRY BROWN, JENNIFER BROWN,     )  Case No. 13-cv-01451-SC
    JANE DOE 1, and JANE DOE 2,      )
10                                   )  ORDER GRANTING IN PART AND
               Plaintiffs,           )  DENYING IN PART DEFENDANTS'
11                                   )  MOTION FOR PARTIAL JUDGMENT ON
        v.                           )  THE PLEADINGS
12                                   )
                                     )
13  JON ALEXANDER, DEAN WILSON, ED   )
    FLESHMAN, JULIE CAIN, CINDY      )
14  SALATNAY, and COUNTY OF DEL      )
    NORTE,                           )
15                                   )
               Defendants.           )
16                                   )
    _____)
17

18

19  **I.  <u>INTRODUCTION</u>**

20      Now before the Court is Defendants' motion for partial

21  judgment on the pleadings.  ECF No. 73.  The motion is fully

22  briefed,[1] and the Court finds it suitable for disposition without

23  ────────────────────
    [1] ECF Nos. 75 ("Opp'n"), 76 ("Reply").  Plaintiffs also filed an
24  unauthorized sur-reply.  ECF No. 77.  The Civil Local Rules
    prohibit the parties from filing any "additional memoranda, papers
25  or letters . . . without prior Court approval" except for
    objections to reply evidence or statements of recent decision.  <u>See</u>
26  Civ. L.R. 7-3(d).  Plaintiffs' sur-reply is neither; it contains
    legal argument about the appointment of a guardian ad litem and
27  attaches a declaration from Plaintiffs' attorney.  Plaintiffs filed
    it without seeking leave of the Court, and for that reason it is
28  STRICKEN.  In the future, Plaintiffs should file a motion for leave

**United States District Court**
For the Northern District of California

oral argument pursuant to Civil Local Rule 7-1(b).  For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

## II.  BACKGROUND

### A.  Factual Background

On a motion for judgment on the pleadings, the Court assumes the truth of Plaintiffs' well-pleaded factual allegations.  As a result, these facts are taken from Plaintiffs' second amended complaint, except where otherwise indicated.

Plaintiff Jennifer Brown married Donald Crockett on July 9, 2005.  Mr. Crockett is a co-owner and operator of a flower bulb grower, one of Defendant Del Norte County's ("Del Norte") largest employers.  Mr. Crockett and his family have contributed to a number of electoral campaigns for county officials.  ECF No. 51 ("SAC") ¶ 8.  On January 1, 2007, Ms. Brown and Mr. Crockett's two children, Plaintiffs Jane Doe 1 and Jane Doe 2, were born.  The children are now eight years old; the allegations in the second amended complaint focus on the time period when the children were between two and six years old.  Ms. Brown and Mr. Crockett divorced shortly thereafter, with the two parents sharing custody of the children but with Ms. Brown as their primary caretaker.  Id. ¶ 9.

Plaintiffs allege that Mr. Crockett physically and sexually abused the children on several occasions.  They allege, without providing details, that Mr. Crockett physically abused the children

to file a sur-reply if they feel additional argument is warranted. However, consideration of Plaintiffs' unauthorized sur-reply would not affect this order; as described below, the Court DENIES Defendants' motion to the extent it relates to the minor plaintiffs' guardian ad litem.

on "a number of occasions" prior to 2009.  <u>Id.</u>  In June of 2009, Jane Doe 1 allegedly told Ms. Brown that Mr. Crockett had molested her.  <u>Id.</u> ¶ 10.  Ms. Brown called a county sheriff and reported her daughter's complaints, but the sheriff took no action.  <u>Id.</u>  Ms. Brown took Jane Doe 1 to the hospital, but hospital staff refused to perform a Sexual Assault Response Team ("SART") examination. <u>Id.</u>  One week later, a SART exam was performed at the hospital, but no action or further investigation occurred; neither Mr. Crockett nor Jane Doe 1 were interviewed; and no prior complaints against Mr. Crockett were investigated.  <u>Id.</u>

Plaintiffs allege that several years later, around late November 2011, Jane Does 1 and 2 told Ms. Brown that Mr. Crockett showed them movies of naked men and women on television.  <u>Id.</u> ¶ 11. Ms. Brown reported this to the county sheriff's department, after which a deputy took a taped statement from the daughters but allowed Mr. Crockett to pick them up for visitation.  <u>Id.</u>  No further investigation occurred.  Ms. Brown asked Defendant Ed Fleshman, a county sheriff, and Defendant Jon Alexander, Del Norte's district attorney, as well as other county deputies and a city police officer, why no authorities had taken action.  She was told that her daughters' interview tape had been destroyed and that showing pornography to children was not a criminal offense.  <u>Id.</u>

On January 27, 2012, Jane Does 1 and 2 returned to Ms. Brown's home after staying with their father for several days, after which the girls appeared physically ill and disheveled.  <u>Id.</u> ¶ 12.  Ms. Brown took them to the hospital, where Sutter Coast Hospital Urgent Care ("SCHUC") examined them and filed a report with Child Welfare Services ("CWS"), accusing Mr. Crockett of medical neglect.  <u>Id.</u> ¶

United States District Court
For the Northern District of California

13.   Two days later, on January 29, 2012, Jane Does 1 and 2 returned to the hospital, where SCHUC filed another CWS report alleging that both children claimed that Mr. Crockett had recently sexually molested them.  Id. ¶ 14.  Plaintiffs allege that all of the Defendants were made aware of these claims but chose not to investigate them because Mr. Crockett's family exerted so much political and personal influence in Del Norte.  Id.

On January 30, 2012, Plaintiff Barry Brown (Jennifer's father and the children's maternal grandfather) contacted the District Attorney of neighboring Humboldt County to obtain a SART exam of Jane Does 1 and 2.  Id. ¶ 15.  Plaintiffs did so because they were concerned that Jane Does 1 and 2's complaints had gone ignored; Defendants had not investigated any claims of abuse; and because Mr. Crockett still had court-ordered visitations with his daughters, which Plaintiffs worried would provide opportunities for abuse.  See id.  Mr. Brown contacted Defendants via letter at this point, and also informed Mr. Alexander by phone that he would take Jane Does 1 and 2 out of Del Norte County for their safety.  Id. Mr. Brown communicated with Mr. Alexander, the District Attorney -- per an exception to the California kidnapping statute for cases in which a person with a right to custody of a child who was the victim of domestic violence may take or conceal the child as a protective measure, provided that the person contact the district attorney of the county where the child resided.  See Cal. Pen. Code § 278.7.  Barry and Jennifer then took Jane Does 1 and 2 to Humboldt County.  Id.

A Del Norte magistrate judge issued a warrant for Barry and Jennifer's arrest on February 8, 2012, at the request of Mr.

**United States District Court**
For the Northern District of California

Alexander, Mr. Fleshman, and Dean Wilson (another Del Norte
sheriff).  Id. ¶ 16.  Plaintiffs allege that the affidavit
submitted in support of the warrant alleged that Barry and Jennifer
had kidnapped Jane Does 1 and 2, even though Defendants knew that
the Browns were legally transporting the children to a hospital in
a neighboring county.  Id.  Defendants submitted the warrant and
Mr. Brown's picture to interagency databases and issued an all
points bulletin for Mr. Brown, but no attempt was made to contact
him.  Id.  On February 9, 2012, Mr. Brown was arrested by Mr.
Fleshman, who allegedly consulted Mr. Alexander at the time of the
arrest.  Id.  Plaintiffs claim that Mr. Alexander and Mr. Fleshman
agreed that no charges should be filed against Mr. Brown, but that
Mr. Brown was nonetheless booked on felony child stealing charges,
photographed, and fingerprinted.  Plaintiffs allege that Defendants
thus created a false felony arrest record for Mr. Brown.  Id. ¶¶
16-17.

Mr. Brown was released within hours of his arrest, and no
charges were ever filed.  However, Plaintiffs allege that Mr. Brown
suffered embarrassment and lost business in his job as a private
investigator as a result.  Id. ¶ 18.

Upon her return to Del Norte, Ms. Brown spoke to CWS, which
informed her that Mr. Fleshman had insisted that Jane Does 1 and 2
be placed in foster care.  Id. ¶ 19.  Ms. Brown stayed in touch
with CWS and prepared the children to move in with their foster
family.  On March 10, 2012 -- about one month after Mr. Brown's
arrest -- Ms. Brown was waiting for the children to be moved into
foster care, when county sheriffs, a SWAT team, and other local law
enforcement officials arrived at her home.  Id. ¶ 19.  She was not

United States District Court
For the Northern District of California

shown the arrest warrant, nor was she told why she was being
arrested.  According to Ms. Brown, six police officers used
excessive force to subdue and arrest her, though she did not
resist.  Id.  After handcuffing Ms. Brown's hands behind her back,
the six officers allegedly punched and kicked Ms. Brown and slammed
her head and body against a wall and wrought iron bed.  Id.  She
was then jailed in a glass holding cell for two days and mocked by
Del Norte County jail staff.  Id.  Plaintiffs also allege that Ms.
Brown was denied medication for various medical conditions during
her incarceration.  They further allege that Mr. Alexander and the
county jail staff demeaned Ms. Brown by throwing a pizza party just
outside the glass cell to taunt her and celebrate her arrest.  Id.

Plaintiffs assert that, as a result of Ms. Brown's arrest,
Jane Does 1 and 2 were taken into CWS custody and placed in a
foster home.  Id. ¶ 20.  Ms. Brown was told neither she nor Mr.
Crockett would have access to the children there.  Id.  The foster
home was run by a close friend of Mr. Crockett's girlfriend, who
allowed Mr. Crockett access to the girls, while Ms. Brown was
denied visitation.  Id.  Around June 15, 2012, Defendants Julie
Cain and Cindy Salatnay, both CWS employees, removed Jane Does 1
and 2 from the foster home and transferred primary custody to Mr.
Crockett.  Id. ¶ 21.  Ms. Brown was given only supervised
visitation, and Mr. Crockett allegedly was able to approve the
court-appointed monitors personally.  Id.  Deborah Cain (apparently
not Defendant Julie Cain) was one such monitor.  See id.  In August
2012, Deborah attempted to report one of the daughters' statements
that someone they met at Mr. Crockett's house was going to take
them away to Mexico.  Id. ¶ 22.  CWS apparently "laughed at her and

**United States District Court**
For the Northern District of California

1    refused to document the report," leading Deborah to report the

2    matter to a federal agency.  <u>Id.</u>

3        On January 17, 2013, Arlene Kasper, a non-defendant visitation

4    monitor, reported seeing Ms. Salatnay (the assigned case worker)

5    interview Jane Does 1 and 2, who told Ms. Salatnay of Mr.

6    Crockett's history of molestations.  <u>Id.</u> ¶ 23.  Plaintiffs allege

7    that Ms. Kasper saw Defendant Salatnay examine Jane Doe 1's

8    genitals and state that "there's something here."  <u>Id.</u>  Plaintiffs

9    report that Ms. Kasper asked Defendant Salatnay what she would do

10   at that point, in response to which Defendant Salatnay "said that

11   there was nothing she could do, as she had been told by her

12   supervisor, [Defendant Cain], that no matter what Jane Doe 1 or 2

13   said, [Defendant Salatnay] was to come back with either an

14   inconclusive or unsubstantiated report.  [Defendant Salatnay] said

15   also that her hands were tied because of her supervisor [Defendant

16   Cain]."  <u>Id.</u>

17       Later, around February 21, 2013, Jane Does 1 and 2 were again

18   taken into custody by CWS and placed into a foster home pursuant to

19   California Welfare and Institutions Code Section 300, which grants

20   the juvenile court jurisdiction over children adjudged to be

21   dependents.  <u>Id.</u> ¶ 24; Cal. Welf. & Inst. Code § 300.  CWS

22   documented Jane Doe 2's January 17, 2013 report of molestation by

23   Mr. Crockett.  <u>Id.</u> ¶ 24.  CWS also stated that it would not return

24   custody of Jane Does 1 and 2 to Ms. Brown, because she had created

25   stress on the children by reporting abuse and molestation.  <u>Id.</u>

26   Around March 5, 2013, Ms. Salatnay took Jane Does 1 and 2 to Napa

27   County, where they were interviewed for a half-hour each by a male

28   detective.  <u>Id.</u> ¶ 25.  The children apparently refused to

**United States District Court**
For the Northern District of California

substantiate the molestation or abuse allegations, so CWS (through Ms. Cain and Ms. Salatnay) decided to return the girls to Mr. Crockett's custody, "without court authorization and in spite of the fact that a [Welfare and Institutions Code Section 300] petition hearing had been held and a subsequent jurisdictional hearing set for the following week." Id. ¶ 25.  The children were back in Mr. Crockett's custody by March 8, 2013.  Id. ¶ 26.  After being denied access to the girls entirely, Ms. Brown was then allowed minimal, supervised visits.  Id.  A week later, Ms. Salatnay provided a jurisdictional report to the juvenile court in which she allegedly "intentionally lied and misled the court, arguing that [Jane Does 1 and 2] should be left in [Mr. Crockett's] custody." Id.

   **B.    State Court Proceedings**

   California state courts have already reviewed and ruled upon many of the issues raised in the SAC.  Those rulings were issued in the various divorce, custody, and juvenile dependency proceedings.[2] What follows is a non-exhaustive summary of some of the relevant juvenile dependency proceedings in California Superior Court and the California Court of Appeal.

   At a jurisdictional hearing during the custody proceedings, the Del Norte Superior Court adopted the Del Norte Department of

---

[2] Several of the state court opinions upon which Defendants rely are unpublished.  Generally speaking, unpublished California Court of Appeal opinions "must not be cited or relied on by a court or a party in any other action."  Cal. R. Ct. 8.1115(a).  However, an exception exists "[w]hen the opinion is relevant under the doctrines of law of the case, res judicata, or collateral estoppel . . . ."  Id. 8.1115(b)(1).  Because these opinions are relevant under the doctrine of collateral estoppel, Defendants may rely on them for the purposes of this motion.

**United States District Court**
For the Northern District of California

Health and Human Services' disposition report, continuing the children in Mr. Crockett's custody. <u>See</u> <u>In re N.C.</u>, No. A138503, 2014 WL 1790395, at *1, 5 (Cal. Ct. App. May 6, 2014). Ms. Brown had the opportunity to testify, call witnesses, and present evidence of her allegations of abuse and neglect. <u>Id.</u> at *2-3. Ms. Brown also had the opportunity to argue that Mr. Crockett and his family "are very wealthy and influential members in Del Norte County (they are personal friends of the sheriff, his mother is a former county supervisor, and they have friends and family all working within the Department of social Services and Child Welfare Services in particular)." <u>Id.</u> at *5. She additionally moved to disqualify the judge initially assigned to the case for bias. The motion was granted and the case assigned to another judge. <u>Id.</u> at *2. Ms. Brown also argued that the County Department of Health and Human Services was biased against her because of Mr. Crockett's friends and influence. <u>Id.</u> at *5. Though the Superior Court declined to find that the alleged molestation never happened, it acknowledged "a substantial reservation . . . as to the truth of these alleged sexual molestation issues." <u>Id.</u> at *4. Ms. Brown appealed, and the California Court of Appeal affirmed. The California Court of Appeal found that "[t]he allegations of sexual abuse by Father [Mr. Crockett] were unsubstantiated." <u>Id.</u> at *8.

The Superior Court later considered a number of Ms. Brown's requests to modify the rules governing her visitation rights and custody of the children. It granted some and denied others, again adopting the Del Norte Department of Health and Human Services' recommendations. <u>In re N.C.</u>, No. A140027, 2014 WL 2860915, at *1-4 (Cal. Ct. App. June 24, 2014). The Superior Court found that the

**United States District Court**
For the Northern District of California

evidence of sexual abuse of the children was "very
unpersuasive . . . . The testimony was stilted and not persuasive.
And I don't think that -- I did not find it [sex abuse] to be
true." Id. at *4. Ms. Brown again appealed, and the California
Court of Appeal again affirmed. Id. at *4. The Court of Appeal
held that "the Department properly characterized the sex abuse
allegations as 'unfounded,' 'untrue,' or 'inconclusive.'" Id. The
Court of Appeal also noted that "Mother argues that the court had
no substantial evidence from which to conclude that return to her
custody would be detrimental to the Twins. But the CASA's report
for the six-month review opined that returning the Twins to Mother
'would jeopardize [them] significantly.'" Id. at *5. Ms. Brown
also "contend[ed] that current orders must be reversed because the
court 'considered and relied upon substantial factual and legal
misrepresentations made by the Department.'" Id. at *4. The Court
of Appeal found those arguments unavailing.

In February of 2014, the Superior Court conducted an interim
review of the children's status. It required Ms. Brown to
participate in psychological counseling and restricted her
visitation based on a psychologist's report. It also denied Ms.
Brown's parents (the children's maternal grandparents, one of whom
is Mr. Brown) de facto parent status. Ms. Brown and Mr. Brown
appealed, "contend[ing] that the court made multiple errors at the
interim review that adversely affected their interests . . . ." In
re N.C. (N.C. IV), No. A141406, 2014 WL 7184749, at *1 (Cal. Ct.
App. Dec. 17, 2014). The California Court of Appeal "conclude[d]
that their arguments lack[ed] merit and affirm[ed]." Id.

After a series of hearings in April and May of 2014, the

1   Superior Court dismissed the children's juvenile dependency cases.

2   It "gave Father and Mother joint legal custody of the Twins, and

3   the Father sole physical custody." In re N.C. (N.C. V), No.

4   A141846, 2014 WL 7190886, at *3 (Cal. Ct. App. Dec. 17, 2014).  The

5   Superior Court held that "[the children are] not being molested,

6   period.  And they weren't molested.  So that I want set [aside]."

7   Id. at *4.  Ms. Brown again appealed, and the California Court of

8   Appeal once again affirmed.  Id. at *6.

9

10  **III.  LEGAL STANDARD**

11      "After the pleadings are closed -- but early enough not to

12  delay trial -- a party may move for judgment on the pleadings."

13  Fed. R. Civ. P. 12(c).  "Judgment on the pleadings is proper when

14  the moving party clearly establishes on the face of the pleadings

15  that no material issue of fact remains to be resolved and that it

16  is entitled to judgment as a matter of law." Hal Roach Studios,

17  Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir.

18  1989).  Moreover, a motion for judgment on the pleadings is subject

19  to the same standard of review as a motion to dismiss, and thus the

20  pleading must contain sufficient factual matter, accepted as true,

21  to state a claim to relief that is plausible on its face. Johnson

22  v. Rowley, 569 F.3d 40, 43-44 (2d Cir. 2009); see also United

23  States ex rel. Cafasso v. General Dynamics C4 Systems, Inc., 637

24  F.3d 1047, 1055 n.4 (9th Cir. 2011) (citing Johnson).  A claim is

25  plausible on its face when the plaintiff pleads "factual content

26  that allows the court to draw the reasonable inference that the

27  defendant is liable for the misconduct alleged." Ashcroft v.

28  Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly,

United States District Court
For the Northern District of California

11

1   550 U.S. 544, 556 (2007)).

2

3   **IV.  <u>DISCUSSION</u>**

4       Defendants make several different arguments in their motion.

5   First, they argue that the minor children's claims should be

6   dismissed because Mr. Brown, who serves as their guardian ad litem,

7   lacks standing to represent them.

8       Next, Defendants argue that certain of Plaintiffs' claims

9   should be dismissed under the <u>Rooker-Feldman</u> doctrine.  Plaintiffs

10  bring several state or common law causes of action, including

11  conspiracy, false imprisonment, defamation, abuse of process,

12  intentional infliction of emotional distress, and negligence.  They

13  also bring claims under 42 U.S.C. Section 1983, alleging that

14  Defendants violated their First, Fourth, and Fourteenth Amendment

15  rights.  The First Amendment claims are based on the allegation

16  that Defendants deprived Plaintiffs of the right to associate with

17  their family members (i.e. with their children, grandchildren,

18  mother, or grandfather).  Defendants argue that the First Amendment

19  (and related Fourteenth Amendment and Section 1983) claims, and

20  those claims only, are barred by the <u>Rooker-Feldman</u> doctrine and

21  collateral estoppel.  Finally, Defendants argue that Defendants

22  Cain and Saltanay should be dismissed if the Court grants their

23  motion for judgment on Plaintiffs' First and Fourteenth Amendment

24  claims.

25      **A.   <u>The Minor Plaintiffs</u>**

26      Defendants first argue that the minor plaintiffs' claims must

27  be dismissed because their court-appointed guardian ad litem lacks

28  standing to represent them.  On April 17, 2013, on ex parte

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  application from Plaintiffs, the Court appointed Barry Brown (the

2  children's paternal grandfather) to represent the children as their

3  guardian ad litem.

4      **1.   Elk Grove**

5      In support of their argument, Defendants cite only one case:

6  Elk Grove Unified School District v. Newdow, a Supreme Court case

7  decided in 2004.  542 U.S. 1 (2004).  According to Defendants, Elk

8  Grove stands for the proposition that a "noncustodial father could

9  not bring an action on behalf of his minor child on a First

10 Amendment challenge; under California law only the custodial mother

11 had the exclusive right to litigate as the child's 'next of

12 friend.'"  See Opp'n at 13-14.

13     That is not all the correct interpretation of Elk Grove.  Elk

14 Grove was a case in which a father sued to assert his own

15 constitutional right to instruct his minor daughter on religious

16 matters.  The father, an atheist, objected to the practice of

17 public schoolteachers leading his daughter's classes in the Pledge

18 of Allegiance each day because the Pledge includes the phrase

19 "under God."  See Elk Grove, 542 U.S. at 4-5.  The minor daughter

20 was not a party to the lawsuit when it reached the Supreme Court,

21 and the Court's only holding was that the father lacked standing to

22 bring suit on his own behalf to preclude the school from leading

23 the Pledge.  The father lacked standing to "forestall his

24 daughter's exposure to religious ideas that her mother, who wields

25 a form of veto power [because she had been awarded sole legal

26 custody of their daughter], endorses, and to use his parental

27 status to challenge the influences to which his daughter may be

28 exposed in school when he and [the mother] disagree."  Id. at 17.

The father lacked standing to make such an "ambitious" claim because the mother had exclusive legal custody of the child.  <u>Id.</u> at 10, 17.

The Supreme Court did mention in <u>Elk Grove</u> that the father could not sue as his daughter's next friend.  Defendants interpret that line as a broad holding that California law prohibits anyone other than a custodial parent from serving as a child's next friend or guardian ad litem.  <u>See</u> Opp'n at 13-14.  However, that is neither a correct statement of the holding from <u>Elk Grove</u> nor of California law.  The father in <u>Elk Grove</u> could not act as his child's next friend (the case never mentions guardians ad litem at all) because the California Superior Court had awarded sole legal custody to her mother <u>and</u> the Superior Court entered an order <u>specifically prohibiting the father from representing his daughter</u> in the <u>Elk Grove</u> lawsuit.  <u>See</u> <u>Newdow v. U.S. Cong.</u>, 313 F.3d 500, 502 (9th Cir. 2002).  Those facts are entirely inapplicable to this case; Ms. Brown and Mr. Crockett share legal custody of the children, and no state court has issued an order regarding Ms. Brown or Mr. Brown's ability to represent the children as a guardian ad litem.  On the contrary, California law permits the Court to appoint a guardian ad litem who is not a parent when the parent's interests conflict with the child's.  <u>See</u> <u>Berg v. Traylor</u>, 148 Cal. App. 4th 809, 821 (2007).  Moreover, this motion concerns the <u>children's</u> standing, while <u>Elk Grove</u> dealt with the <u>father's</u> standing.

### 2.   Federal Rule of Civil Procedure 17(c)

The Court appointed Mr. Brown the children's guardian ad litem pursuant to Federal Rule of Civil Procedure 17(c).  That Rule

permits certain representatives, such as a general guardian, committee, conservator, or like fiduciary to sue or defend on behalf of a minor.  Fed. R. Civ. P. 17(c)(1).  The Rule also provides for situations in which a minor does not have a duly appointed representative:

> A minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court must appoint a guardian ad litem -- or issue another appropriate order -- to protect a minor or incompetent person who is unrepresented in an action.

Fed. R. Civ. P. 17(c).  The Second Circuit has explained the Rule's effect:

> Rule 17(c) has always been viewed as permissive and not mandatory. It gives a federal court power to authorize someone other than a lawful representative to sue on behalf of an infant or incompetent person where that representative is unable, unwilling or refuses to act or has interests which conflict with those of the infant or incompetent.

Ad Hoc Comm. of Concerned Teachers v. Greenburgh No. 11 Union Free Sch. Dist., 873 F.2d 25, 29 (2d Cir. 1989).  Indeed, "[f]ederal courts . . . have repeatedly affirmed a court's power to determine that the interests of a child or incompetent will be best represented by a 'next friend' or guardian ad litem and not by an authorized representative such as a parent or general guardian." Id. at 30.  "The minor's best interests are of paramount importance in deciding whether a Next Friend should be appointed, but the ultimate decision as to whether or not to appoint [a Next Friend or guardian ad litem] rests with the sound discretion of the district court and will not be disturbed unless there has been an abuse of its authority."  Sam M. ex rel. Elliott v. Carcieri, 608 F.3d 77, 85 (1st Cir. 2010) (internal quotation marks omitted).

United States District Court
For the Northern District of California

1    Contrary to Defendants' assertion that only a custodial parent

2  may serve as a guardian ad litem, the rules permitting a court to

3  appoint a guardian ad litem exist for precisely the situation in

4  which the child's interests are best served if he or she is

5  represented by someone <u>other</u> than a custodial parent or other

6  general guardian.  <u>See</u> <u>Concerned Teachers</u>, 873 F.2d at 30; <u>Suits by</u>

7  <u>or Against Infants and Incompetent Persons -- In General</u>, 6A Fed.

8  Prac. & Proc. Civ. § 1570 (3d ed.) ("But what if the infant or

9  incompetent has a general representative who refuses to act or

10  whose own interests conflict with those of the person being

11  represented?  Courts, both state and federal, always have had the

12  power to appoint special representatives under these circumstances,

13  and the decided cases indicate that this power has been preserved

14  by Rule 17(c).").

15    Because this suit was brought when Ms. Brown and Mr. Crockett

16  were embroiled in an acrimonious custody dispute, and because Mr.

17  Crockett was originally a named defendant, the Court deemed it

18  prudent to appoint Mr. Brown the children's guardian ad litem for

19  this action.  Regardless, this is not a motion challenging Mr.

20  Brown's suitability as a guardian ad litem.  The only issue before

21  the Court is whether Mr. Brown's appointment as guardian ad litem

22  deprives the children of standing.  The law is clear that it does

23  not.  Defendants' motion is DENIED to the extent it seeks dismissal

24  of the minor plaintiffs' claims for lack of standing.

25    **B.    The Rooker-Feldman Doctrine**

26    "<u>Rooker-Feldman</u> is a powerful doctrine that prevents federal

27  courts from second-guessing state court decisions by barring the

28  lower federal courts from hearing de facto appeals from state-court

**United States District Court**
For the Northern District of California

judgments . . . ."  Bianchi v. Rylaarsdam, 334 F.3d 895, 898 (9th Cir. 2003).  "If a plaintiff brings a de facto appeal from a state court judgment, Rooker-Feldman requires that the district court dismiss the suit for lack of subject matter jurisdiction." Kougasian v. TMSL, Inc., 359 F.3d 1136, 1139 (9th Cir. 2004).  In Rooker v. Fidelity Trust Company, the Supreme Court held that federal district courts lack jurisdiction to hear appeals from state court rulings.  See Rooker v. Fid. Tr. Co., 263 U.S. 413, 415-16 (1923).  That ruling was extended by District of Columbia Court of Appeals v. Feldman, which held that district courts lack jurisdiction over allegations that are "inextricably intertwined" with state court decisions, "even if those challenges allege that the state court's action was unconstitutional."  D.C. Court of Appeals v. Feldman, 460 U.S. 462, 486, 487 (1983).

At first blush, it seems that Defendants may be correct. Plaintiffs do ask the Court to evaluate whether Ms. Brown and Mr. Brown were improperly denied access to the children (and vice-versa).  That certainly demands that the Court consider issues very similar to those decided in the various state court custody cases. Indeed, one commentator has described cases like this one as a common application of Rooker-Feldman: "Often the federal plaintiff will allege that the judgment against him was the result of fraud or conspiracy; although principles of res judicata do not always bar such claims, courts have held that Rooker-Feldman precludes jurisdiction."  Suzanna Sherry, Judicial Federalism in the Trenches: The Rooker-Feldman Doctrine in Action, 74 Notre Dame L. Rev. 1085, 1093 (1999).

In response, Plaintiffs cite almost no law at all.  The only

United States District Court
For the Northern District of California

effort Plaintiffs make at analyzing the law is to attempt to distinguish one of the cases Defendants cite.  See Opp'n at 4-5. Instead, Plaintiffs rely primarily on the Court's previous order granting in part and denying in part Defendants' motion to dismiss Plaintiffs' original complaint.  One of Defendants' arguments in that motion was that the case should be dismissed under the doctrine of Younger abstention, which is related to but distinct from Rooker-Feldman.  In that order, the Court wrote that the "ongoing state proceedings" were "not at all related to Plaintiffs' present claims."  See ECF No. 52 ("MTD Order") at 16.  However, the Court noted that the parties' explanations of the state court cases were "sparse", that "the record on these points is not entirely clear," and that the facts that form the basis of Plaintiffs' allegations in this case arose "long after the family dispute in state court."

That no longer appears to be the case.  For one, the California Court of Appeal has now affirmed several of the verdicts in Defendants' favor, and, as Plaintiffs themselves point out, all of those decisions came after Plaintiffs filed this case.  More importantly, the arguments Plaintiffs made in support of their custody and visitation rights in state court were based on many of the same factual allegations as the First Amendment claims in this case.  See ECF No. 74 ("RJN") Ex. A at 1-4.  The fact that Plaintiffs bring constitutional, rather than state family law, claims here does not save those claims from the Rooker-Feldman doctrine.  See Bianchi v. Rylaarsdam, 334 F.3d 895, 900 n.4 (9th Cir. 2003) ("The Rooker-Feldman doctrine prevents lower federal courts from exercising jurisdiction over any claim that is

**United States District Court**
For the Northern District of California

1   'inextricably intertwined' with the decision of a state court, even

2   where the party does not directly challenge the merits of the state

3   court's decision but rather brings an indirect challenge based on

4   constitutional principles.").  It certainly seems that a First

5   Amendment claim alleging that Barry and Jennifer Brown were

6   wrongfully denied association with the children is intertwined with

7   the state court decisions that denied them custody.

8        That said, the Ninth Circuit has developed specific

9   requirements for the application of <u>Rooker-Feldman</u>.  The Ninth

10  Circuit has held that "for <u>Rooker-Feldman</u> to apply, a plaintiff

11  must seek not only to set aside a state court judgment; he or she

12  must also allege a legal error by the state court as the basis for

13  that relief."  <u>Kougasian v. TMSL, Inc.</u>, 359 F.3d 1136, 1140 (9th

14  Cir. 2004).  Put another way,

15
16        [i]f a federal plaintiff asserts as a legal wrong an
          allegedly erroneous decision by a state court, and seeks
17        relief from a state court judgment based on that
          decision, Rooker-Feldman bars subject matter jurisdiction
18        in federal district court.  If, on the other hand, a
          federal plaintiff asserts as a legal wrong an allegedly
19        illegal act or omission by an adverse party, Rooker-
          Feldman does not bar jurisdiction.

20  <u>Noel v. Hall</u>, 341 F.3d 1148, 1164 (9th Cir. 2003).

21       Plaintiffs do not allege any legal wrong on the part of the

22  state courts.  The only allegation even mentioning the state courts

23  is that Defendant Salatnay "intentionally lied and misled the

24  court" when she provided a report recommending that the children be

25  left in Mr. Crockett's custody.  <u>See</u> SAC ¶ 27.  Rather, Plaintiffs

26  allege wrongdoing only by Defendants, none of whom are state courts

27  or judges.  Nor do Plaintiffs seek relief from any state court

28  order.  Indeed, Plaintiffs' case was filed before many of the state

court decisions from Defendants accuse them of seeking relief.  The

state court orders defendants cite deal with the custody of the

children and the rights of the parents and grandparents with

respect the children.  Plaintiffs do not seek any relief from those

orders; they request only monetary damages.  Id. at 21.

The Court is bound by the Ninth Circuit's holdings in Noel and

Kougasian that Rooker-Feldman applies only where (1) a federal

plaintiff asserts a legal error by the state court and (2) the

relief sought is to set aside the erroneous state court order.

Neither prerequisite is met here.  Rooker-Feldman does not deprive

the Court of jurisdiction over any of Plaintiffs' claims.

Defendants' motion for judgment on the pleadings as to Plaintiffs'

First and Fourteenth Amendment Section 1983 claims for lack of

jurisdiction under the Rooker-Feldman doctrine is DENIED.

### C.   **Issue Preclusion**

As an alternative, Defendants argue that Plaintiffs' First and

related Fourteenth Amendment claims are barred by issue preclusion

(also referred to as collateral estoppel).  "In determining the

collateral estoppel effect of a state court judgment, federal

courts must, as a matter of full faith and credit, apply that

state's law of collateral estoppel."  In re Bugna, 33 F.3d 1054,

1057 (9th Cir. 1994).  "Accordingly, the collateral estoppel effect

of the state court determination of fraud here is governed by

California law."  Id.  For issue preclusion to bar a claim, six

criteria must be met: "(1)the issue sought to be precluded from

relitigation must be identical to that decided in a former

proceeding; (2) the issue to be precluded must have been actually

litigated in the former proceeding; (3) the issue to be precluded

United States District Court
For the Northern District of California

must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding; and (6) application of issue preclusion must be consistent with the public policies of preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." White v. City of Pasadena, 671 F.3d 918, 927 (9th Cir. 2012).

### 1. **Identical Issue**

"The 'identical issue' requirement addresses whether 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." Hernandez v. City of Pomona, 46 Cal. 4th 501, 511-12, 207 P.3d 506, 514 (Cal. 2009).

Determining whether issues identical to Plaintiffs' First and Fourteenth Amendment claims were litigated in state court requires a precise definition of what those issues are.  The Court begins with an overview of the legal basis for Plaintiffs' claims.  "It is well established that a parent has a 'fundamental liberty interest' in 'the companionship and society of his or her child' and that '[t]he state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § ]1983.'" Lee v. City of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001).  "[T]his constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents." Id. "Moreover, the First Amendment protects those relationships,

**United States District Court**
For the Northern District of California

including family relationships, that presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." Id. (internal quotation marks omitted).

There appear to be four distinct bases for Ms. Brown's denial of familial association claims. First, Plaintiffs allege that the children were initially removed from Ms. Brown's custody and placed in foster care in March of 2012 "[a]s a result of [her] arrest and without benefit of due process hearings . . . ." See SAC ¶¶ 19-20. Second, Plaintiffs assert that the children were removed from foster care on June 15, 2012 and primary custody was wrongly awarded to Mr. Crockett in spite of the allegations that he abused and neglected the children. See id. ¶ 21. Third, the children were placed in foster care again in February of 2013, due again to molestation allegations against Mr. Crockett. Plaintiffs allege that the children were not sent back to their mother because of an unfounded allegation that Ms. Brown "had created stress on the children by reporting abuse and molest [sic]." Id. ¶¶ 24-25. Fourth, Plaintiffs allege that CWS wrongly returned the children to Mr. Crockett's custody on March 8, 2013. Related to that allegation, Plaintiffs allege that Ms. Brown was wrongly "denied access to any information regarding the girls . . . ." Id. ¶¶ 25-26.

It is undeniable that many of those precise issues have been litigated in the state courts. As described above, the parties have extensively litigated the truth of the allegations of abuse and neglect against Mr. Crockett. The parties have also

**United States District Court**
For the Northern District of California

extensively litigated the relative suitability of Mr. Crockett and
Ms. Brown to be the children's primary caretaker.  The parties have
even litigated Ms. Brown's claims that the state court relied on
misrepresentations from Defendants in making its findings.  The
state court also heard Ms. Brown's allegations of corruption and
cronyism within the Del Norte County bureaucracy.  Except for the
first, all of Ms. Brown and the children's First Amendment claims
involve identical issues to those litigated in state court: the
truth of the allegations against Mr. Crockett, the suitability of
Mr. Crockett and Ms. Brown to have primary custody of the children,
and the claim that Mr. Crockett and county officials made
misrepresentations during the dependency proceedings.

The Court finds that the denial of familial association claims
premised on the state court's decisions to award Mr. Crockett
primary custody on June 15, 2012; the placement of the children in
foster care in February 2013; and the return of the children to Mr.
Crockett's custody on March 8, 2013 are issues that have already
been litigated in state court.  Those, therefore present only
identical issues to those previously litigated.  However, the claim
that the children were initially removed from Ms. Brown's custody
and placed in foster care on the basis of Ms. Brown's allegedly
unlawful arrest on in March of 2012 does not appear to have been
litigated in the state courts.  Neither the lawfulness of the
arrest nor whether the arrest was a legitimate reason to remove the
children from her care has previously been litigated.  Therefore,
Defendants' motion is DENIED as to Ms. Brown's and the children's
First and Fourteenth Amendment claims premised on those events.
Whether the children actually were removed from her custody for

**United States District Court**
For the Northern District of California

that reason, and whether Ms. Brown or her children deserve monetary compensation (which is the only relief they seek in this action) for unconstitutional denial of familial association following Ms. Brown's arrest remain open questions.

As for Mr. Brown's claims, the only plausible denial of familial association claim comes from the decisions -- by both the county agencies and the state courts -- to award physical custody to Mr. Crockett and to limit or terminate the children's visits with their maternal grandparents.  These issues, too, have already been litigated in the state courts.  <u>See</u> <u>N.C. IV</u> at *3-7.[3]

Plaintiffs' primary argument against the application of collateral estoppel is that Defendants' arguments is "without factual basis" because "this Court has already ruled that it may not take judicial notice of 'facts' contained in other court proceedings concerning the parties in this case . . . ."  Opp'n at 5.  That argument stems from a fundamental misunderstanding of the Court's previous order and the very basics of the rules of evidence.  In its previous order, the Court took judicial notice of certain documents related to the state court proceedings.  The Court noted that it took notice of "these documents' existence and the state court proceedings" but not "the truth of any fact from any of the RJNs' exhibits."  MTD Order at 2-3.

Plaintiffs apparently interpret that ruling to mean that the Court, even though it <u>granted</u> Defendants' request for judicial

---

[3] The children's First and Fourteenth Amendment claims are merely the inverse of Mr. Brown's and Ms. Brown's claims; the children allege that they were denied free association with their grandfather and mother based on the same facts.  Therefore those claims were litigated in state court to the same extent that Mr. Brown's and Ms. Brown's claims were.

notice of the documents produced in the state court proceedings, must ignore those documents and pretend the state court proceedings never occurred (even though it is undisputed that they did). That was not at all the effect of the Court's previous order. By declining to take judicial notice of "the truth of any fact" in the state court documents, the Court simply held that the state court's factual findings do not bind this Court. For example, that the state court determined the molestation allegations were baseless does not mean that this court has found those allegations to be baseless. However, this Court does notice the fact that the state court found the allegations to be baseless. That is, the Court takes notice of the state court's findings, even if those factual findings do not establish the same underlying facts for the purposes of this case. In the context of issue preclusion, notice of the state court findings is sufficient to establish that the issues litigated are identical, even though this Court does not adopt the state court's factual findings.

### 2.   **Actually Litigated**

The second element of issue preclusion asks whether the identical issue was "actually litigated" in the former proceeding. Here, Ms. Brown raised the issue of the molestation and abuse allegations on multiple occasions before the Superior Court. The Superior Court repeatedly held that the allegations against Mr. Crockett were unpersuasive and did not create a concern that the children were unsafe with him. That process culminated in the court's determination that the children were not being molested and had not been molested, as well as the Court of Appeal's affirmance of that finding. See N.C. V, 2014 WL 7190886 at *4, 6. Similarly,

**United States District Court**
For the Northern District of California

the custody dispute was extensively litigated and finally decided
when the court awarded joint legal custody to Ms. Brown and Mr.
Crockett and sole physical custody to Mr. Crockett.  Again, that
ruling was affirmed by the California Court of Appeal.  There can
be no doubt that these issues were actually litigated in the state
courts.

### 3.   Necessarily Decided

The next element of issue preclusion is that the identical
issue actually litigated in the former proceeding was necessarily
decided in that proceeding.  As described above, not only has the
California Superior Court decided these issues, but the California
Court of Appeal has affirmed those decisions.

### 4.   Final and on the Merits

"[T]he determination of an issue by final judgment in a
juvenile dependency proceeding is conclusive upon the parties or
their privies in a subsequent suit."  Kasdan v. Cnty. of Los
Angeles, No. CV 12-06793 GAF JEMX, 2014 WL 6669354, at *5 (C.D.
Cal. Nov. 24, 2014); see also In re Joshua J., 39 Cal. App. 4th
984, 993 (Cal. Ct. App. 1995), as modified (Oct. 25, 1995)
(juvenile dependency proceeding was a final judgment on the
merits).  Here, the Superior Court dismissed the juvenile
dependency cases and made a final decision as to custody.  See
Kasdan, 2014 WL 6669354, at *5 (when "the dependency court
expressly 'terminated jurisdiction over [Plaintiff's] children'"
the decision became final on the merits).

### 5.   Party Against Whom Preclusion is Sought is the Same
### Party as in the Former Proceeding

"[A]lthough the focus of a dependency proceeding is on the

child, a parent served with a notice of the proceeding has the status of a party in the juvenile dependency proceeding." Id. at *5.  Ms. Brown and her children were therefore parties in the juvenile dependency proceeding.

It is less clear that Mr. Brown was a party to the state court proceedings.  He was not a party to the divorce proceedings.  See ECF No. 27 ("RJN") Exs. B-C.  During the dependency proceedings, the Superior Court judge told Mr. Brown: "You're not a party to the case.  You're here as an accommodation."  N.C. IV, 2014 WL 7184749, at *5.  That, however, was before Mr. Brown filed a request for de facto parent status.  See id.  Once Mr. Brown's application was denied, Mr. Brown appealed, and he is listed as an appellant in the caption of N.C. IV.  The Superior Court adjudicated his de facto parent status for the children, and he appealed that decision (unsuccessfully) to the California Court of Appeal.  See N.C. IV at *3-7.  The Court finds that Mr. Brown was sufficiently a party to the state court proceedings regarding his de facto parent status to support the application of issue preclusion based on those proceedings.

Plaintiffs argue that this factor militates against the application of issue preclusion because Defendants Alexander, Wilson, Fleshman, Cain, and Salatnay were not parties to the state court proceedings.  Plaintiffs miss the fact that California's issue preclusion standard requires only that "the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding."  Lucido v. Superior Ct., 51 Cal. 3d 335, 341 (Cal. 1990) (emphasis added).  All four plaintiffs in this case were parties to the state court proceedings, and issue

United States District Court
For the Northern District of California

preclusion is sought only against those plaintiffs; it is not sought against any defendant who was not a party to the state court proceedings.  This factor, too, favors the application of issue preclusion in this case.

### 6.   Public Policy Concerns

The public policy concerns relevant to issue preclusion are "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." White, 671 F.3d at 927.  In Kadsan, the Central District of California faced a similar situation to this one: the loser of a state court custody battle sought to recast his custody claims as federal constitutional claims.  The Kadsan court explained the public policy concerns involved:

> (1) there are substantial protections afforded parents in child custody proceedings and both federalism and comity counsel against federal court's relitigating issues of credibility decided in a state forum; (2) allowing such collateral attacks would be contrary to judicial economy; and (3) allowing such attacks would potentially create infinite litigation, thereby undermining one of the main purposes of a judgment.  As stated before, the doctrine of issue preclusion exists precisely to prevent such conduct.

Kasdan, 2014 WL 6669354 at *6.  Speaking more generally, domestic relations are paradigmatic examples of the sort of dispute properly handled by state courts.  As the Supreme Court has observed, "[s]o strong is our deference to state law in this area that we have recognized a 'domestic relations exception' that 'divests the federal courts of power to issue divorce, alimony, and child custody decrees.'"  Elk Grove, 542 U.S. at 12.  That language dealt specifically with the domestic relations exception to federal jurisdiction, but it nonetheless illustrates the strong policy

28

1   preference for litigating child custody in state courts.  The Court

2   agrees and finds that the public policy concerns strongly favor the

3   application of issue preclusion to bar relitigation of issues

4   already decided in the state courts.

5           **7.  <u>Extrinsic Fraud</u>**

6       Though neither party raises this issue, the Court notes that

7   state court orders obtained by extrinsic fraud do not have

8   collateral effect.  <u>See</u> <u>In re Lake</u>, 202 B.R. 751, 758 (B.A.P. 9th

9   Cir. 1996) ("A state court judgment is subject to collateral attack

10  if the state court lacked jurisdiction over the subject matter or

11  the parties, or the judgment was procured through extrinsic

12  fraud.").  "Extrinsic fraud is a broad concept which covers a

13  number of situations.  'Its essential characteristic is that it has

14  the effect of preventing a fair adversary hearing, the aggrieved

15  party being deliberately kept in ignorance of the action or

16  proceeding, or in some other way fraudulently prevented from

17  presenting his claim or defense.'"  <u>Lovato v. Santa Fe Int'l Corp.</u>,

18  151 Cal. App. 3d 549, 554 (Cal. Ct. App. 1984) (quoting 5 Witkin,

19  Cal. Procedure (2d ed. 1971)).

20      Plaintiffs allege numerous fraudulent actions by Defendants,

21  including concealing or failing to report evidence and lying to the

22  state court.  However, none of those allegations amount to

23  <u>extrinsic</u> fraud.  "In order to be considered extrinsic fraud, the

24  alleged fraud must be such that it prevents a party from having an

25  opportunity to present his claim or defense in court."  <u>Green v.</u>

26  <u>Ancora-Citronelle Corp.</u>, 577 F.2d 1380, 1384 (9th Cir. 1978).

27  Though Plaintiffs allege that Defendants were dishonest in their

28  reports and testimony, there are no allegations that Plaintiffs

**United States District Court**
For the Northern District of California

1    were denied an opportunity to present their claims in court.  On

2    the contrary, the records of the state court proceedings

3    demonstrate that Plaintiffs were given ample opportunities to

4    present their evidence and arguments.  Thus the Court finds that

5    the extrinsic fraud exception does not apply in this case.

6              **8.   Conclusion**

7        The Court finds that all six elements of issue preclusion

8    favor the dismissal of Plaintiffs' First and Fourteenth Amendment

9    claims, except for the claims premised on Ms. Brown's allegedly

10   unlawful arrest.  Defendants' motion is accordingly DENIED with

11   respect to the claim that Defendants unconstitutionally deprived

12   Ms. Brown of the right to freely associate with her children (and

13   vice versa) as a result of her arrest.  The motion is GRANTED with

14   respect to all of Plaintiffs' other First and Fourteenth Amendment

15   claims.

16       **D.   Defendants Cain and Salatnay**

17       Defendants argue that Defendants Cain and Saltanay should be

18   dismissed if the Court grants their motion for judgment on

19   Plaintiffs' First and Fourteenth Amendment claims.  The Court

20   granted that motion only in part.  Plaintiffs allege that

21   Defendants Cain and Salatnay were involved in the removal of the

22   children from foster care in June of 2012 and the decision to

23   return the children to Mr. Crockett's custody in March 2013.  See

24   SAC ¶¶ 21, 24.  However, the only claim related to custody of the

25   children that remains in this case is the claim premised on the

26   children's removal to foster care after Ms. Brown's arrest in March

27   of 2012.  The SAC does not allege that either Ms. Cain or Ms.

28   Salatnay was involved in that incident.  See SAC ¶¶ 19-20.  As a

United States District Court
For the Northern District of California

1  result, Defendants' request is GRANTED and Defendants Cain and

2  Salatnay are DISMISSED from this action.

3

4  **V.  CONCLUSION**

5      For the reasons described above, Defendants' motion for

6  judgment on the pleadings is GRANTED IN PART and DENIED IN PART.

7  The motion is DENIED to the extent that Defendants seek dismissal

8  of Jane Doe 1's and Jane Doe 2's claims for lack of standing.  The

9  motion is also DENIED to the extent it seeks dismissal due to the

10 Rooker-Feldman doctrine.  The motion is GRANTED on the grounds of

11 issue preclusion as to all of Plaintiffs' First and Fourteenth

12 Amendment claims, except that the motion is DENIED as to Ms.

13 Brown's and the children's claims that Defendants deprived them of

14 the right to associate with one another as a result of Ms. Brown's

15 arrest in March of 2012.  The motion to dismiss Defendants Cain and

16 Salatnay is GRANTED, and those defendants are DISMISSED.

17 Plaintiffs' state and common law claims and Section 1983 claims

18 premised on violations of their Fourth Amendment rights were not

19 subjects of this motion and are unaffected by this Order.  Those

20 claims remain viable.

21

22      IT IS SO ORDERED.

23

24      Dated: April 15, 2015                    _____

25                                               UNITED STATES DISTRICT JUDGE

26

27

28

31